# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **ANA M. MIOCIC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 11 C 0005** |
| | ) | |
| **v.** | ) | **Magistrate Judge Morton Denlow** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Claimant Ana M. Miocic ("Plaintiff" or "Claimant") brings this action under 42 U.S.C. 405(g), seeking reversal and/or remand of the final decision by Michael J. Astrue, Commissioner of Social Security ("Defendant" or "Commissioner"), denying Claimant's application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Claimant asks the Court to reverse the decision of the ALJ and remand to the Commissioner for an award of benefits or, in the alternative, reverse and remand for further proceedings. The Commissioner asks the Court to affirm the Commissioner's final decision. For the following reasons, the Court grants Claimant's summary judgment motion to reverse the decision of the Commissioner, denies the Commissioner's summary judgment motion to affirm the same, and remands the case to the Commissioner for further proceedings consistent with this opinion.

# I.  BACKGROUND FACTS

## A.    Procedural History

Claimant first filed an application for DIB on April 2, 2008 alleging a disability onset date of December 31, 2007.  R. 154-62.  The Social Security Administration ("SSA") denied her DIB application on June 12, 2008 and denied her request for reconsideration on September 5, 2008.  R. 115-16.[1]  Shortly thereafter Claimant filed a timely request for a hearing and on September 11, 2009 Administrative Law Judge ("ALJ") Jose Anglada presided over a hearing at which Claimant appeared with her attorney.  R. 445-89.  On September 28, 2009, the ALJ rendered a decision unfavorable to Claimant, finding that she was not under a disability at any time between January 26, 2008 (the date she last worked) and June 30, 2008 (her date last insured).  R. 12-21.  The Appeals Council denied Claimant's request for review and the ALJ's decision became the final order of the Commissioner.  R. 1-3.  Claimant subsequently filed this action for review pursuant to 42 U.S.C. § 405(g).  The parties have consented to this Court's jurisdiction pursuant to 28 U.S.C. § 636(c).  Dkt. 18. An oral argument was held on August 28, 2012.

---

[1]The ALJ noted in his opinion that Claimant's application for SSI was denied on April 2, 2008 because her income exceeded the limits of Title XVI.  R. 12.  This denial is not part of the record, but the parties do not contest that Claimant's DIB application is the only issue.

### B.  Hearing Testimony - September 11, 2009

#### 1.    Ana Miocic - Claimant

At the time of the hearing, Claimant was thirty-six years old.  R. 450.  She is divorced and has two daughters who live with her ex-husband.  R.450, 461.  She has earned her GED. R. 450.

In 1990, Claimant was diagnosed with Systemic Lupus Erythematous ("SLE" or "Lupus").  R. 40.[2]  Despite this diagnosis, she continued to work at a grocery store from March 1990 to October 1999.  R. 182.  This work involved stocking shelves, ordering merchandise, and cashiering.  R. 454.  Claimant was fired from that job after quarreling with a co-worker.  R. 40.  She next held a series of part-time and seasonal jobs from February 2005 to January 2006, working variously as a janitor, bartender, and retail worker.  R. 182.

Claimant's most recent employment was from July 2006 to January 26, 2008 during which time she worked approximately 24 hours a week as a cashier at a casino.  R. 193. Because Claimant earned $2,519 at the casino in January 2008 her date last insured was modified from December 31, 2008 to June 30, 2008.  R. 14.[3]

---

[2]The record contains testimony from a hearing before an ALJ in 2004.  R. 26-66.  The Court's primary focus is on the testimony before ALJ Anglada in 2009 but will reference background facts from the 2004 hearing, as ALJ Anglada referenced it and apparently reviewed that testimony.  R. 449-50.

[3] Although Claimant claimed both a DLI and alleged disability onset date of December 31, 2007 when she applied for SSI and DIB, R. 167, the ALJ determined in his written opinion that these dates were inappropriate because Claimant worked until January 28, 2008. R. 15.  Thus, Claimant must show she became disabled during the five-month period from when she stopped working on January 28, 2008 through when her insured status expired on June 30, 2008.  Both parties accept these revised dates.

Claimant reported that this employment ended because she often missed work or left early because of lupus-related pain and fatigue. There is some confusion in the record as to whether Claimant quit the casino job or was fired. When the ALJ asked why Claimant left her casino job, she stated that the casino "found their way you know, out" of employing her after having "issues with [her]. . . calling in sick quite a bit and going home early." R. 456. Explaining why she was calling in sick, Claimant explained that her pain had "finally caught up to [her]" and "there was just way too much pain. I couldn't do it." R. 457.

Claimant testified that she has not worked since leaving the casino, though she searches online for work that she could perform from her home. R. 452-53; 469-70. She did not specify whether she was searching for full-time or part-time employment, and neither the ALJ nor her attorney asked her to elaborate on that aspect of her search. From January 2008 until July 2009, Claimant received state unemployment benefits of approximately $700 per month. R. 452.

Claimant stated that she takes Imuran, Prednisone, Amitriptyline, Phenobarbital, and other drugs to manage her symptoms. R. 85. She also testified that she treats with her rheumatologist, Dr. Sarah Everakes, every two months. *Id.* She sometimes skips appointments because her symptoms are too painful or she doesn't wish to travel to Dr. Everakes's office. *Id.*

Claimant lives alone though stays with her parents when she is not feeling well. R. 461. Regarding her daily activities, she cooks simple meals for herself, but her mother often

brings her food.  R. 462.  She goes grocery shopping about twice a month and tries to do laundry at least once a week.  *Id.*  She cleans her house a little at a time, often over several days, but has particular difficulty with sweeping and vacuuming.  R. 87).  Claimant spends most of the day watching television and uses the computer for about five hours each week.  R.463, 470.  Although she used to love crocheting, she can no longer do it because of hand difficulties.  R. 463.  She has problems opening bottles and cans because her hands stiffen and fingers swell.  470-71.

As for her physical abilities, Claimant can lift a gallon of milk, but sometimes it takes two hands.  R. 464.  She can walk about a block without resting, stand for five to ten minutes, and sit for about one hour before needing to stand up.  R. 466.  Sitting causes discomfort in her lower back.  *Id.*  Claimant takes Tylenol 3 (with codeine) and over-the-counter Tylenol to manage this back pain, though she finds neither drug effective.  R. 468-69.

In response to questioning by her attorney, Claimant testified that she does not believe that she could work a part-time job for twenty hours per week, nor could she reach repetitively over the course of a day.  R. 470-71.  She testified that she is "physically exhausted 24/7," and that her constant pain and stress affect her ability to concentrate and remember things.  R. 474.  When asked whether there are any days during which she is symptom free, Claimant replied "absolutely not," though some days are better than others.  R. 477.

## 2. Thomas Dunleavy - Vocational Expert

Thomas Dunleavy testified as a vocational expert ("VE"). R. 479. Claimant's previous relevant work experience included her work as a cashier and sales clerk. R. 480-81.

The ALJ presented the VE with a detailed hypothetical person of Claimant's age, education, and work experience who is limited to light work but can only stand and walk for two hours in an eight-hour workday and who can not frequently bend, climb, or do work that requires "frequent and rapid handling and manipulation for prolonged periods." R. 482. The VE testified that such a person could not perform Claimant's past relevant work. *Id.*

After clarifying that jobs which require fast paced, ongoing handling or rapid manipulation would not be available, the VE testified that the hypothetical person could perform the work of an unskilled cashier, of which there are 2500 jobs in Chicago. R. 482-83. The hypothetical person would also be able to perform the work of a visual inspector, of which there are 2000.[4] R. 483. The VE clarified that the cashier occupation he identified was more sedentary than Claimant's previous cashier position and did not require rapid handling. R. 482-83. As examples of these unskilled cashier jobs, the VE listed parking lot and theater ticket booth cashiers. *Id.*

The VE testified that a person with the foregoing limitations would be unable to work if she also had any of the following limitations:: (1) was unable to get out of bed at least one day a week; (2) had concentration limited to two hours; or (3) had handling and manipulation

---

[4] This category of work involves sorting, comparing, and inspecting objects. By way of illustration, the VE listed table worker (DOT 739.687-182) and touch-up screener (DOT 726.684-110), in which a worker uses a "comparator" to examine the uniformity of printed circuits. R. 483.

limited only to "occasionally." R. 484-488. Finally, the ALJ asked the VE to examine the RFC assessments prepared by Dr. Everakes on November 10, 2008. R. 488-89. The VE concluded that a person with such limitations described in those opinions, individually or in combination, would be unable to work. *Id.*

**C. Medical Evidence**

**1. Medical Evidence Between the Day Claimant Last Worked, January 26, 2008, and Claimant's Date Last Insured, June 30, 2008.**

On March 9, 2008, forty-two days after Claimant stopped working at the casino, she went to the emergency room at Provena St. Joseph Medical Center (the "ER") for shortness of breath and hand pain caused by a lupus flare-up. R. 263. Claimant stated that she had "just got over a URI [upper respiratory]/sinus infection." *Id.* Dr. Peter Stockmal, the ER physician, diagnosed her symptoms as caused by lupus but reported an otherwise unremarkable physical examination and normal x-ray and EKG findings. R. 263-64. Claimant declined oral medication for home, stating that she already had steroidal medication and would restart Elavil for her pain. *Id.* Dr. Stockmal recommended that Claimant increase her Prednisone for the next three days. R. 264.

On April 2, 2008, Claimant returned to the ER for left wrist pain and pain and swelling in two fingers that began that day. R. 260. The ER physician, Dr. Claude Sadvosky, reported that Claimant had no specific trauma that might have caused the pain, though he noted her history of lupus. *Id.* Aside from some "slight" tenderness and swelling in her fingers, Dr. Sadvosky found an otherwise normal physical examination, with full and

normal ranges of motion in her wrist, fingers, and elbow. *Id.* Once again, Claimant was diagnosed with lupus. *Id.* Dr. Sadovsky called a rheumatologist (presumably Dr. Everakes) who stated that Claimant had normal blood work the past week and recommended increasing her Prednisone. *Id.*

On April 8, 2008, around 4 a.m., Claimant returned to the ER. R. 291. The medical record does not reveal why she sought treatment, but she was diagnosed with "myalgias" (muscle pains) and administered Prednisone and Dilaudid. *Id.*

On April 16, 2008, Dr. John Meyer, an osteopath at Rush University Medical Center, reviewed x-rays of Claimant's hands. R. 270. Dr. Meyer found there was "evidence of fracture or dislocation" and that she had "mild periarticular osteopenia" (decreased bone density around the joints) that indicated "early inflammatory arthropathy." R. 270. Dr. Meyer reported no clear bone erosion. *Id.* On June 1, 2008, Claimant went to the ER for an unspecified reason. R. 290. She was diagnosed with "R/A Fibromyalgia" and given hydomorphone HCl (generic for Dilaudid). *Id.*

On June 11, 2008, state agency psychiatric consultant Jerrold Heinrich, Ph.D. prepared a Psychiatric Review Technique Form for Claimant. R. 271. Dr. Heinrich concluded that he could not determine disability because there was no medical evidence in Claimant's file before December 31, 2004, the listed DLI. R. 283. The same day, medical consultant Dr. Richard Bilinsky completed a request for medical advice. R. 285. As with Dr. Heinrich, Dr. Bilinsky concluded he could not assess disability because there was no

relevant medical evidence before December 31, 2004.[5]  R. 287.

## 2.    Medical Evidence After June 30, 2008, Claimant's Date Last Insured.

On July 13, 2008, Claimant was seen at the ER for what was diagnosed as "oral thrush" (oral yeast infection) and "gen weakness."  R. 288.  She was administered hydromorphone.  *Id.* On July 25, 2008, she was seen in the emergency room at Adventist Bolingbrook Hospital for a bladder infection and bronchitis.  R. 298.

Starting five days later, from July 30, 2008, to August 3, 2008, Claimant was hospitalized at Rush University Medical Center after a referral from Dr. Everakes for a possible lupus flare. R. 309.  Claimant  also complained that her bladder infection was still painful despite the medication.  *Id.*  Upon intake, Claimant had stable vital signs and appeared "nontoxic."  *Id.*  She was administered her usual doses of Prednisone and given intravenous narcotics for pain.  *Id.*  A rheumatologist agreed that Claimant was likely having a lupus flare and recommended increasing her Prednisone to 60 mg each day and adding methotrexate and amitriptyline,  *Id.*  Her pain "improved somewhat," and she was "weaned off [intravenous] narcotics" before her discharge on August 3, 2008.  *Id.*

Claimant returned to Rush Medical Center three days later, complaining of "generalized weakness, back pain, lightheadedness, mouth sores, and bilateral lower extremity weakness. "  R. 311.  Upon intake, her vital signs were stable but she was in "mild

---

[5]Again, there appears to be some confusion in the record.  Dr. Bilinsky wrote that Claimant became eligible for DIB on October 1, 2007, but her date last insured was December 31, 2004. R. 287.  Regardless, for the purpose of evaluating the ALJ's decision the relevant piece of information is that the state agency doctors were not able to offer an opinion on Claimant's RFC during the relevant time period.

distress" and given morphine. *Id*. As before, she was given intravenous narcotics and her standard doses of Prednisone. *Id*. The rheumatologist recommended starting Elavil and Lyrica (for pain from damaged nerves) and increasing Prednisone to 40 mg daily. Doppler exams (a form of ultrasound test) showed no evidence of "significant" arterial disease in Claimant's lower extremities. *Id*. Other imaging was not notable. R. 311-12. Claimant's lower extremity weakness "slowly continued to improve on IV morphine," and she was discharged on August 11, 2008. *Id*.

On September 21, 2008, Claimant went to the ER for lupus-related pains. R. 386. She returned on December 7, 2008, for "multiple myalgias." R. 370. X-rays of both knees taken on December 11, 2008 revealed "evidence of mild supra-patellar effusion" (fluid above the knee cap) in the right knee but no evidence of fractures or dislocations. R. 351-54. The left knee findings were normal. *Id*.

On May 7, 2009, Claimant went to the ER complaining of joint pain in her shoulders, knees, hips, and ankles lasting for over one year with "an exacerbation of pain that day after cleaning house." R. 19. Claimant was diagnosed with "arthralgia to shoulders, hips, knees, ankles." R. 356.

Claimant's case was reviewed by Dr. Francis Vincent, MD on September 4, 2008. R. 315. Dr. Vincent indicated that he could not assess an RFC because there was no medical evidence on or before December 31, 2007, the listed date last insured. R. 315. On

September 1, 2008, Dr. Russell Taylor, PhD, a psychologist, also reviewed Claimant's file and reached the same conclusion. *Id.*

### 3. Dr. Sarah Everakes, M.D. - Claimant's Treating Rheumatologist

Claimant's testimony in 2004 indicates that she has treated with Dr. Sarah Everakes, a rheumatologist, since 2000. R. 35. Dr. Everakes performs regular blood tests and prescribes medication for Claimant. *Id.* Claimant typically visits Dr. Everakes every two months, although she sees her more frequently when her lupus flares up. R. 36. She claims that these flare-ups cause a number of debilitating symptoms, including muscle and joint pain, swelling, fatigue, lack of appetite, anxiety, and memory loss. R. 172.

On November 10, 2008, four months after Claimant's insured status expired on June 30, 2008, Dr. Everakes completed two Residual Functional Capacity ("RFC") assessments. R. 316-26. Dr. Everakes diagnosed Claimant with lupus and fibromyalgia and noted she saw Claimant "every month or two." R. 316. Dr. Everakes opined that Claimant's prognosis was "fair" and that she had "significant limitations in doing repetitive reaching, handling, or fingering." R. 316, 322. Dr. Everakes noted that in a typical eight-hour workday, Claimant could only sit for two hours, stand/walk for less than two hours, and occasionally carry no more than ten pounds. R. 321-22. Dr. Everakes estimated that Claimant would need to miss work more than three times each month because of her impairments and treatment. R. 323.

## D. The ALJ's Decision

Following a hearing and review of the medical evidence, the ALJ rendered a decision

unfavorable to Claimant on September 28, 2009.  R. 12-21.  The ALJ found that Claimant was not under a disability as defined in the Social Security Act, from January 26, 2008, though the date of his decision, and upheld the denial of DIB and SSI.  R. 21.

The ALJ evaluated Claimant's application under the required five-step sequential evaluation process.  The ALJ first found that Claimant's earnings in January 2008 extended her DLI from December 31, 2007 to June 30, 2008.  R. 14.  The ALJ further adjusted Claimant's alleged onset date from December 31, 2007 to January 26, 2008, her last day of work.  R. 14-15.  The ALJ then determined that Claimant has not engaged in substantial gainful activity since January 26, 2008.  *Id.*

At Step 2, the ALJ determined that Claimant has the severe impairment of lupus.  R. 15.  The ALJ found that there is no evidence documenting a medically determinable mental impairment, fibromyalgia, or seizure disorder.  *Id.*  At Step 3, the ALJ concluded that Claimant's lupus did not meet or medically equal any impairment listed in 20 C.F.R. § 404.1520, Appendix 1, specifically noting that she did not meet the requirements in Listing 14.02 (Systemic Lupus Erythematosus).  R. 15-16.

The ALJ then determined that Claimant has the residual function capacity ("RFC"), to perform light work as defined in 20 C.F.R. § 404.1567(b), but can only stand or walk up to two hours in an eight-hour workday.  R. 16.  The ALJ further found that Claimant could only occasionally bend, climb, and use stairs, but not frequently.  *Id.*  Similarly, the ALJ determined that Claimant cannot perform any work requiring "frequent and rapid handling

and manipulation for prolonged periods, but could do so occasionally." *Id.*

In assessing Claimant's credibility, the ALJ found that while her "medically determinable impairment could reasonably be expected to cause some of the alleged symptoms . . . her statements and testimony concerning the intensity, persistence, and limiting effects of these symptoms for the period on and prior to June 30, 2008, when her insurance status expired, are not fully credible and are not fully supported by the medical evidence." R. 17. The ALJ identified several inconsistencies between Claimant's statements, the reasons she left her most recent job, and her receipt of unemployment benefits. *Id.* While the ALJ found it reasonable to "assess some limitations," he ultimately determined that the medical evidence before June 30, 2008 did not support Claimant's claims that she "would miss work up to one day a week, was limited to only occasional handling and manipulation, or could concentrate[e] only two hours." R. 18.

The ALJ considered Dr. Everakes's opinions, and concluded they "were not entitled to controlling weight under SSR 92-6p and [were] of no probative value for the period in question." *Id.* Specifically, the ALJ decided the "extreme limits" Dr. Everakes described were "not mentioned or indicated in any of the medical records" between January 26, 2008 and June 30, 2008. *Id.*

At step four, the ALJ found that Claimant could not perform her past relevant work. R. 19. At step five, the ALJ found that considering Claimant's age, education, experience, and RFC there are a significant number of jobs in the national economy that Claimant can

perform.  R. 20.

## II.  LEGAL STANDARDS

### A.    Standard of Review

The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  A decision by an ALJ becomes the Commission's final decision if the Appeals Council denies a request for review. *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000).  Under such circumstances, the district court reviews the decision of the ALJ.  *Id.*  The reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  A "mere scintilla" of evidence is not enough.  *Id.*; *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002).  Even when the record contains adequate evidence to support the decision, the findings will not be upheld if the ALJ does not "build an accurate and logical bridge from the evidence to the conclusion."  *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008).  If the Commissioner's decision lacks evidentiary support or an adequate discussion of the issues, it must be remanded.  *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010).

Though the standard of review is deferential, a reviewing court must "conduct a critical review of the evidence" before affirming the Commissioner's decision.  *McKinzey v.*

*Astrue*, 641 F.3d 884, 889 (7th Cir. 2011). It may not, however, "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010). Thus, judicial review is limited to determining whether the ALJ applied the correct legal standards and whether substantial evidence supports the findings. *Id.*

**B.    Disability Standard**

Disability insurance benefits are available to a claimant who can establish he is under a "disability" as defined by the Social Security Act. *Liskowitz v. Astrue*, 559 F.3d 736, 739-40 (7th Cir. 2009). "Disability" means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual is under a disability if he is unable to perform his previous work and cannot, considering his age, education, and work experience, partake in any gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2)(A). Gainful employment is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

A five-step sequential analysis is utilized in evaluating whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(i-v). The ALJ must inquire, in the following order: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4)

whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing other work. *Id.* Once the claimant has proven he cannot continue his past relevant work due to physical limitations, the ALJ must determine whether other jobs exist in the economy that the claimant can perform. *Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008).

## III. DISCUSSION

Claimant raises the following issues in support of her motion: (1) whether the ALJ gave insufficient weight to Dr. Everakes' assessments and erroneously failed to recontact her for clarifying information; (2) whether the ALJ sufficiently explained how he reached Claimant's RFC; and (3) whether the ALJ properly assessed her credibility. The Court will discuss each in turn.

### A. The ALJ Erred in His Determination that the Opinions of Claimant's Treating Rheumatologist Has No Probative Value for the Period in Question.

An ALJ makes an RFC determination by weighing all the relevant evidence of record. 20 C.F.R. §404.1545(a)(1); SSR 96-8p, 1996 WL 374184. In doing so, he must determine the weight to give a treating physician's opinion. §404.1527(d)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."). A treating physician's medical opinion is entitled to controlling weight when "it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence." *Id.*; *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010).

If an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must "give good reasons" for his decision. 20 C.F.R. § 404.1527(d)(2); *see Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010). In that situation, an ALJ must then determine how much weight to afford that opinion by considering a number of factors identified in 20 C.F.R. § 404.1527(d)(2). Those factors include: the length, nature, and extent of the physician and claimant's treatment relationship; whether the physician supported his opinions with sufficient explanations; the consistency of the opinion with the record as a whole; whether the physician specializes in the medical conditions at issue; and any other factors brought to the attention of the ALJ. 20 C.F.R. § 404.1527 (d)(2)-(6).

In the case at bar, the ALJ determined that because Dr. Everakes's assessments were completed after the date last insured and considered limitations that began after the date last insured, her opinions were of no probative value. Claimant argues this was in error. The Court finds that given the all or nothing significance of the June 30, 2008 date, the ALJ should have sought further input from Dr. Everakes or some other medical expert to assist him in evaluating Claimant's condition as of June 30, 2008.

While a claimant bears the burden of proof to demonstrate that she is disabled, social security hearings are not adversarial proceedings;[6] indeed, the ALJ himself has a duty to fully and fairly develop that record. 20 C.F.R. § 404.1527(c)(3) ("If the evidence is consistent but we do not have sufficient evidence to decide whether you are disabled, or if after weighing

_____

[6] Indeed, the Court's decision in this matter does not excuse Claimant's counsel at the hearing level from failing to ask the doctor to clarify her position once the ALJ made clear that the relevant date was June 30, 2008.

the evidence we decide we cannot reach a conclusion about whether you are disabled, we will try to obtain additional evidence....  We will request additional existing records, recontact your treating sources or any other examining sources, ask you to undergo a consultative examination oat our expense, or ask you or others for more information."); s*ee Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004) (noting that an ALJ has a "duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernable" and finding that the ALJ should have contacted the plaintiff's doctor for more detail).

Regarding her burden, Claimant did in fact produce the opinion of her longtime treating rheumatologist, her own testimony regarding the time period in question, and records of multiple emergency room visits. *See Scott v. Astrue*, 647 F.3d 734, 739-40 (7th Cir. 2011) ("[But the claimant] did produce evidence in the form of her own testimony as well as medical evidence....  If the ALJ found this evidence insufficient, it was her responsibility tor recognize the need for additional medical evaluations.").  If the ALJ had questions about the onset of specific symptoms or when Claimant reached the assessed level of disability, the ALJ had several options: he could have recontacted the treating doctor; he could have had a medical expert testify; or he could have sent Claimant for an independent evaluation. Instead of taking one of these steps, he determined that Dr. Everakes's opinion had "no probative value."

In the Lupus RFC Questionnaire, Dr. Everakes indicated that she saw Claimant every

month or two and that Claimant suffers from both lupus and fibromyalgia.   R. 316.

Claimant's testimony and her original Form SSA-3368 indicate that she began treatment with

Dr. Everakes at Rush in the early 1990s and with Dr. Everakes in 2000.   R. 35, 175.   Dr.

Everakes noted that Claimant's impairments had "lasted or [could] be expected to last at least

12 months."  R. 320.   Because Dr. Everakes submitted her opinions just four months after

Claimant's DLI, having treated Claimant for many years, including during the January 26

through June 30, 2008 period, these findings very likely referred to Claimant's condition

before her insured status expired.   Given the longevity and frequency of the treatment

relationship (two factors the ALJ was required to consider but did not) the ALJ improperly

concluded that Dr. Everakes's opinion had no probative value where the record reflects a

long term treating relationship and consistent treatment for lupus, fibromyalgia, and related

symptoms which pre-date the date last insured.

        Moreover, given that the state agency doctors determined that they could not offer an

RFC, the ALJ should have supplemented the medical evidence given the proximity of Dr.

Everakes's assessment to Claimant's date last insured.   The severity of the impairments

assessed by Dr. Everakes in November 2008 suggests that Claimant was likely suffering

from impairments before the date last insured, even if of lesser severity.   *See, e.g.*, *Allord v.*

*Barnhart*, 455 F.3d 818, 822 (7th Cir. 2006) ("Retrospective diagnosis of an impairment,

even if uncorroborated by contemporaneous medical records, but corroborated by lay

evidence relating back to the claimed period of disability, can support a finding of past

impairment.").

Given the length and frequency of the treating relationship, Dr. Everakes could offer a "detailed and longitudinal" view of Claimant's limitations. § 404.1527(d)(2). Ultimately, the ALJ did not give good reasons for rejecting the opinions of such a specialist, offered only four months after Claimant's insured status expired. Thus, the ALJ committed reversible error in treating Dr. Everakes's assessment as having no probative value and failing to supplement the medical record by either seeking further input from Dr. Everakes or a medical expert regarding Claimant's condition as of June 30, 2008.

**B.     In Light of Additional Medical Evidence Gathered Upon Remand, the ALJ Should Reassess Claimant's Residual Functional Capacity.**

Under the regulations, an ALJ's RFC assessment "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005) (citing SSR 96-8p at *7). If an ALJ fails to explain how he arrived at his RFC conclusion, "this omission in itself is sufficient to warrant reversal." *Briscoe*, 425 F.3d at 352.

The ALJ reviewed the medical evidence and ultimately concluded: "Despite the weak medical evidence on and prior to June 30, 2008, I do find it reasonable to assess some limitations and would therefore conclude that she could only be on her feet standing/walking up to two hours in an eight hour workday, she could not do any frequent bending, climbing, or negotiating of stairs, and she could not do work that required frequent and rapid handling and manipulation for prolonged periods." R. 18. Claimant argues that the ALJ failed to

sufficiently articulate how he arrived at this RFC.

Once the ALJ rejected Dr. Everakes's opinions he developed an RFC based on the other evidence. Given the evidence that remained, the Court finds that the ALJ made a good faith attempt to evaluate how much Claimant could do. However, in determining that Dr. Everakes's assessments are of no probative value to the period in question, the ALJ created an evidentiary deficit upon which he could rely. While the ALJ did note that the medical evidence revealed some "slight" tenderness and swelling in Claimant's fingers and a possibility of early inflammatory arthropathy, he failed to provide a sufficient narrative discussion of how the record supports his determination of Claimant's functional capacity.

While the Commissioner is correct that the ALJ need not "rely entirely on a particular physician's opinion," *Brewer v. Chater*, 103 F.3d 1384, 1393 (7th Cir. 1996), the ALJ may not play doctor and fill in evidentiary medical deficits. *See Suide v. Astrue*, 371 Fed. App'x 684, 689-90 (7th Cir. 2010) ("Even assuming that Dr. Orris's opinions did not deserve greater weight, it is the evidentiary deficit left by the ALJ's rejection of his reports—not the decision itself—that is troubling. The rest of the record simply does not support the parameters included in the ALJ's residual functional capacity determination."). Moreover, while the ALJ cited some evidence of Claimant's swollen hands, the ALJ did not identify any medical evidence to substantiate his believe that Claimant could meet the described physical requirements. *Scott*, 647 F.3d at 740.

Claimant could not be expected to anticipate that the ALJ would afford Dr. Everakes's

opinion no probative value because the form was completed after the date last insured where the treating relationship began long before Claimant's insurance expired. Accordingly, the Court finds that the ALJ failed to sufficiently articulate how he reached the RFC–in large part because he did not cite to, rely upon, or give even minimal weight, to any medical evidence that supports the abilities he concluded Claimant retained. Thus, in light of the Court's instruction that the ALJ should supplement Dr. Everakes's opinion, upon remand the ALJ should revisit the RFC and provide a narrative description of how he reaches Claimant's RFC.

**C. In Light of the Remand, the ALJ Should Reassess Claimant's Credibility.**

Claimant contends that the ALJ's credibility determination was erroneous. Because an ALJ is "in the best position to determine the credibility of a witness," a court reviews the credibility determination "deferentially." *Craft*, 539 F.3d at 678. A credibility determination will be overturned by a court only when it is "patently wrong." *Id.* An ALJ must consider "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence." 20 C.F.R. §§ 404.1529(c)(4); 416.929(c)(4). In determining whether a credibility determination is patently wrong, the Court examines whether the ALJ's determination was reasoned and supported. *Jens v. Barnhart*, 347 F.3d 209, 213-24 (7th Cir. 2003). The ALJ must consider a number of factors imposed by the regulations, 20 C.F.R. § 404.1529(c), and must support a credibility finding with evidence in the record. *Smith v. Astrue*, 11 C 2838, 2012 U.S. App.

LEXIS 5122, at *10-11 (7th Cir. Mar. 12, 2012). An ALJ may not ignore the claimant's statements regarding pain and other symptoms or disregard them merely because they are not substantiated by subjective medical evidence. SSR 96-7p, 1996 WL 3784186, at *1. The Court concludes that while the ALJ's credibility determination was not patently wrong, it should be revisited upon remand.

The ALJ found that Claimant gave contradictory reasons for why she left her job at the casino, and the parties spend much time arguing whether she was fired or quit for medical reasons. Ultimately, Claimant's statements that she "couldn't take it . . . there was way too much pain" and that she "lost her job" are potentially in conflict. The ALJ listed this alleged inconsistency as one of many factors adversely impacting Claimant's credibility: this is not patently wrong.

The ALJ's use of the boilerplate language recently criticized by the Seventh Circuit is also not in error because he went on to conduct a detailed credibility analysis. *See*, *e.g.* *McClesky v. Astrue*, 606 F.3d 351 (7th Cir. 2010). Regarding Claimant's specific testimony, Claimant argues that the ALJ did not believe her testimony that she experienced hand pain and stiffness when squeezing her hands or opening bottles. To the contrary, the ALJ actually accounted for this pain in his RFC determination that she could not perform work requiring "frequent and rapid handling and manipulation for prolonged periods." R. 16.

Claimant argues the ALJ erred in not discussing her testimony that she could not lift an empty laundry basket without pain, that her mother often brought her meals, and the

observations of an SSA employee. It is well-established that an ALJ "is not required to discuss every piece of evidence" so long as he constructs an accurate "logical bridge" between the evidence and his conclusions. *Simila v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2009). Finally, in stating that she does not have any hobbies, the ALJ did not mischaracterize Claimant's testimony where he asked if she had hobbies and she replied: "I used to. I used to love to crochet and that – the very last time I did that was. . . eight years ago . . . . And that was the end of it because the hands just wouldn't – they wouldn't function." R. 463. The ALJ confirmed, "So you don't have any hobbies, then?" and Claimant replied "No. No, I - not anymore I don't." *Id.*

However, there are two points that give the Court pause. First, the ALJ concluded that Claimant's claim of disability was not "fully credible" because she received unemployment insurance from January 2008 until July 2009. The ALJ found that taking unemployment insurance is inconsistent with disability because a recipient "typically must affirm they are capable of working" (R.17).[7] Claimant argues that receiving unemployment insurance does "not necessarily" preclude applying for disability benefits in Illinois, where someone can obtain unemployment benefits if they are looking for part-time work. Moreover, Claimant argues that someone who suffers from a disease with flare-ups (such as lupus) may look for work, hoping to find a job and work for a month or two during a quiescent period of the impairment, yet not believe they could sustain work due to the inevitable flare-ups of the

[7] According to the Illinois Department of Employment Security (IDES), unemployment "[b]enefits are not paid for any day or days on which you are unable to work because of *illness, disability*, family responsibilities, lack of transportation, etc." http://www.ides.illinois.gov/Custom/Library/publications/Publications/What_every_worker_ should_know.pdf (last visited July 31, 2012).

condition.

It is not inappropriate to consider a claimant's unemployment income in a credibility determination. *See Schmidt v. Barnhart*, 395 F.3d 737, 745-46 (7th Cir. 2005) (recognizing receipt of unemployment benefits can impact a claimant's disability claim); *Van Meter v. Astrue*, 09 C 3013, 2010 WL 5232931 (N.D. Ill. Dec. 16, 2010) ("[t]he Court is similarly unpersuaded that the ALJ erred by discussing Plaintiff's unemployment earnings."). However, there is support in the record that Claimant's condition is one that waxes and wanes, she has periodic flare-ups, and her testimony was that she was looking for work she could perform from her home. R. 452. These statements are not inconsistent with her disability claim.

The ALJ also concluded that if Claimant was truly suffering from lupus symptoms when she left the casino on January 26, 2008, she would not have waited until March 9, 2008 to go to the emergency room. A forty-two day delay in going to the emergency room for a flare-up of a disease Claimant has long suffered from does not necessarily support an adverse credibility finding. The record shows that around the time period in question, Claimant was escalating and altering her pain medication. For example, the ALJ acknowledges that Claimant was instructed to increase her Prednisone on April 2, April 8, and around July 30, 2008. R. 18-19. SSR 96-7p ("Persistent attempts by the individual to obtain relief of pain or other symptoms, such as by increasing medications . . . may be a strong indication that the symptoms are a source of distress to the individual and generally lend support to an

individual's allegations of intense and persistent symptoms.").

While not perfect, the ALJ's credibility determination was not "patently wrong." However, in light of the remand the ALJ should revisit his credibility determination, particularly as it relates to Claimant's symptoms around the end of her insured status.

## IV.  CONCLUSION

For the reasons set forth in this opinion, the Court grants Claimant's motion to reverse the decision of the Commissioner, denies the Commissioner's motion to affirm the Commissioner's decision, and remands the case to the Social Security Administration for further proceedings consistent with this opinion.

SO ORDERED THIS 5th DAY OF SEPTEMBER, 2012.

_____
**MORTON DENLOW**
**UNITED STATES MAGISTRATE JUDGE**

**Copies Sent To:**

Barry A. Schultz
The Law Offices of Barry A. Schultz, P.C.
1601 Sherman Avenue, Suite 510
Evanston, Illinois 60201

James M. Kuhn
Assistant United States Attorney
219 S. Dearborn Street
Chicago, Illinois 60604

Anne Kenny Kleinman
Assistant Regional Counsel
200 West Adams Street, 30th Floor
Chicago, Illinois 60606

**Counsel for Plaintiff**

**Counsel for Defendant**